**Joe MOUBRY, a minor, By and Through his parent, Rita MOUBRY, Plaintiff,**

**v.**

**INDEPENDENT SCHOOL DISTRICT NUMBER 696(ELY), Commissioner of Minnesota Department of Education, and the Board of Education for the State of Minnesota, Defendant.**

**Civ. No. 5–95–186.**

United States District Court,
D. Minnesota,
Fifth Division.

May 13, 1996.

Sonya Kerr, Inver Grove Heights, MN, for plaintiff.

Susan E. Torgerson, Charles E. Long, St. Paul, MN, for defendant Independent School Dist. No. 696.

Rachel Kaplan, Asst. Minnesota Atty. Gen., St. Paul, MN, for defendants Comm'r of Minnesota Dept. of Education and Board of Education for State of Minnesota.

## ORDER

KYLE, District Judge.

### Introduction

This matter was referred to United States Magistrate Judge Raymond L. Erickson for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) on the Plaintiff's Motion for Summary Judgment and the Defendants' Motions to Dismiss. In a Report and Recommendation dated March 27, 1996 ("R & R"), Magistrate Judge Erickson recommends the Plaintiff's Motion for Summary Judgment be denied, the Defendant Independent School District's ("District") Motion to Dismiss be granted in part and denied in part, and the Defendants Commissioner of Minnesota Department of Education ("Commissioner") and the Board of Education for the State of Minnesota's ("Board") (collectively the "State Defendants") Motion to Dismiss be granted in part and denied in part. Before the Court are the State Defendants' Objections to the Magistrate Judge's recommendation to deny in part its Motion to Dismiss, and the Plaintiff's response thereto; the Plaintiff and the District have not filed objections.

Plaintiff commenced this action alleging the Defendants violated the Individuals with Disabilities Education Act ("IDEA"), the Americans with Disabilities Act ("ADA"), and various Minnesota state laws. The pertinent factual and procedural background in this matter is fully set forth in the R & R. (*See* R & R at 4–20.)

In the R & R, Magistrate Judge Erickson concluded, *inter alia:* (1) the Commissioner may be held liable for the District's alleged failure to provide the Plaintiff with a free and appropriate public education ("FAPE") (R & R at 47–48); and (2) the Plaintiff's Complaint states a viable ADA claim (R & R 35–39). The State Defendants object to both these conclusions. With respect to the first objection, the Commissioner contends he may not be held liable for the District's alleged failure to provide a FAPE because Plaintiff has not shown the District "significantly breached its responsibility" under the IDEA. (Objections at 4.) With respect to the second objection, the Commissioner and the Board contend Plaintiff's ADA claim is cognizable as an IDEA claim, and as such, should be dismissed because Plaintiff failed to exhaust available IDEA administrative remedies prior to commencing suit.

The Court has independently reviewed the R & R, the State Defendants' objections, the Plaintiff's response, and the material submitted to the Magistrate Judge relative to the State Defendants' Motion as required by 28 U.S.C. § 636(b)(1)(C). The R & R is thorough and well-reasoned. The R & R correctly analyzed the issues raised in the State Defendants' objections, and that analysis will not be repeated here. The Court concurs with the conclusions of Magistrate Judge Erickson and will adopt his R & R in its entirety.

### Conclusion

Accordingly, based upon a de novo review of all the files, records, and proceedings herein, the Report and Recommendation of Magistrate Judge Erickson dated March 27, 1996 (Doc. No. 39) is **ACCEPTED** and **IT IS ORDERED** that:

(1) Defendant Independent School District's Motion to Dismiss (Doc. Nos. 2, 5) is **GRANTED IN PART AND DENIED IN PART** as follows:

(a) Defendant Independent School District's Motion to Dismiss Plaintiff's claim to enforce the HRO's Order is **GRANTED** and this claim is **DISMISSED WITHOUT PREJUDICE;**

(b) Defendant Independent School District's Motion to Dismiss Plaintiff's claims for reimbursement of educational costs and expenses during the 1994–95 school year and claims for compensatory education during the 1994–95 school year is **GRANTED** and these claims are **DISMISSED WITH PREJUDICE;** and

(c) The Independent School District's Motion is, in all other respects, **DENIED.**

(2) State Defendants' Motion to Dismiss (Doc. No. 4) is **GRANTED IN PART AND DENIED IN PART** as follows:

(a) The State Defendants' Motion, with respect to Plaintiff's claims the Commissioner failed to ensure he received special education services from October 1993 through April 1994 and Plaintiffs ADA claims premised upon discrimination in personnel qualifications and the establishment of a state facility devoted to children suffering from apraxia, is **DENIED;** and

(b) The State Defendants' Motion is, in all other respects, **GRANTED;** Plaintiff's claim, as it relates to the Commissioner's monitoring and complaint process, is **DISMISSED WITHOUT PREJUDICE** and Plaintiff's claim, as it relates to the qualifications of the District's "related service personnel," is **DISMISSED WITH PREJUDICE.**

(3) Plaintiff's Motion for Judgment on the Pleadings or, alternatively, for Summary Judgment (Doc. No. 6) is **DENIED.**

## ORDER and REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 27th day of March, 1996.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A) and (B), upon the Plaintiff's Motion for Summary Judgment, upon the Defendants' Motions to Dismiss, and upon the Plaintiff's Motion to Supplement the Record.

A Hearing on the Motions was conducted on November 7, 1995, at which time the Plaintiff appeared by Sonya Kerr, Esq., the Defendant Independent School District No. 696 ("School District") appeared by Susan E. Torgerson and Charles E. Long, Esqs., and the Defendant Commissioner of Minnesota Department of Education and the Defendant Board of Education for the State of Minnesota (collectively referred to as the "Commissioner") appeared by Rachel Kaplan, Assistant Minnesota Attorney General.

For reasons which follow, we grant, in part, the Plaintiff's Motion to Supplement the Record, and we recommend that the School District's Motion to Dismiss be granted in part; that the Commissioner's Motion to Dismiss be granted in part; and that the Plaintiff's Motion for Summary Judgment be denied.

### II. *Procedural and Factual Background*

A. *Procedural Posture.* Pursuant to the Individuals with Disabilities Education Act, *Title 20 U.S.C. § 1400, et seq.* ("IDEA"),[1] the Federal Government ensures that students with disabilities receive a "free, appropriate public education" ("FAPE"). *Title 20 U.S.C. § 1400(c).* The IDEA imposes extensive procedural and substantive requirements on participating State and local agencies to safeguard a disabled student's right to FAPE. Among the procedural safeguards that are mandated by the IDEA, Section 1415(b)(2) requires an independent Due Process Hearing to be conducted by a State educational agency, so as to insure that the parents of handicapped children will be afforded an opportunity to register their complaints concerning a public school's evaluation, or the educational placement of their child. Pursuant to the Act, the State of Minnesota has

1. Prior to amendments in 1990, see, *Pub.L. No. 101–476, § 901(a)(1),* 104 Stat. 1103, 1142 (1990), the IDEA was known as the Education of All Handicapped Children Act ("EHA" or "EAH-CA"). For consistency and convenience, in the course of this Opinion we will address these statutes under the common label of the "IDEA."

promulgated Rules which create a procedure for the conduct of such Hearings. See, *Minnesota Statutes Section 120.17, Subdivision 3b(e); Minnesota Rule 3525.4000;* [2] see also, *Honig v. Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1987) (The procedural safeguards "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate."). In accordance with Minnesota law, two levels of Administrative Review were completed below. See, *Minnesota Statutes Section 120.17, Subdivision 3b(a) and Section 120.17, Subdivision 3b(g); Title 20 U.S.C. § 1415(b)(2).*

At the first level of the administrative process, a Hearing Officer ("HO"), who was appointed by the Minnesota Commissioner of Education, heard seven days of testimony, and concluded that the School District had failed to provide the Plaintiff with FAPE, as required by the IDEA, for the period commencing in October of 1992, and continuing through October 4, 1993, but that the School District was not responsible for its failure to provide services during the period from October 4, 1993, through March of 1994.

The Plaintiff subsequently appealed this determination. A Hearing Review Officer ("HRO"), who was also appointed by Minnesota's Commissioner of Education, conducted an Administrative Review, considered additional evidence and, essentially, affirmed the decision of the HO. In order to furnish a succinctly stated factual context for the discussion which follows, we briefly summarize the Administrative Record before us.

B. *Factual Background.* The Plaintiff, who was born on May 21, 1989, suffers from verbal apraxia [3]—an impairment which has resulted in severe speech communication problems—as well as deficiencies in fine and gross motor skills. The Plaintiff was first diagnosed at the University of Minnesota Clinic, in Minneapolis, in July of 1992. At that time, the Plaintiff was 3 years old, and his Mother ("Moubry") was concerned that his speech was not developing in a normal manner.

In August of 1992, Moubry began driving the Plaintiff to Duluth for weekly speech services in the Robert F. Pierce Clinic at the University of Minnesota—Duluth. At that time, the Plaintiff resided in Ely, Minnesota, a rural community which is located approximately 150 miles northwest of Duluth. The Clinic did not charge for the speech services, and Moubry was reimbursed for her transportation costs by a social service agency.

On September 9, 1992, Moubry referred the Plaintiff to Childlink—an interagency review team which refers children in need of special education and related services to the School District. On September 22, 1992, Childlink referred the Plaintiff to the School District for an early childhood development assessment. Moubry agreed to an assessment on September 29 and, on October 6, 7, and 13, 1992, the assessment was conducted. Testing staff included Denise Dreschler ("Dreschler"), Speech Clinician, Vickie Salmela ("Salmela"), Occupational Therapist, and Linda Jensen ("Jensen"), Early Childhood Special Education ("ECSE") teacher.

Based upon this assessment, as well as treatment notes from the Robert F. Pierce

---

**2.** Minnesota Statutes Section 120.17, Subdivision 3b(e) provides as follows:

Parents, guardians, and the district shall have an opportunity to obtain an impartial due process hearing initiated and conducted by and in the school district responsible for assuring that an appropriate program is provided in accordance with state board rules, if the parent or guardian continues to object to: (1) the proposed formal educational assessment or proposed denial of a formal educational assessment of their child * * *.

In addition, Minnesota Statutes Section 120.17, Subdivision 3b(e) and Minnesota Rule 3525.4000 provide, in part, as follows:

The hearing shall take place before an impartial hearing officer mutually agreed to by the school board and the parent or guardian. If the school board and the parent or guardian are unable to agree on a hearing officer, the school board shall request the commissioner to appoint a hearing officer.

**3.** Apraxia is marked by an inability to execute purposeful learned motor acts, despite the physical ability and willingness to do so. *The Merck Manual,* at p. 1395 (16th Ed.1992).

Clinic, a meeting was conducted on October 27, 1992, to develop an Individual Education Plan ("IEP").[4] Present at the meeting were Moubry, who was accompanied by her legal advocate, Linda Bonney ("Bonney"); Lavonne See ("See"), who was an early childhood coordinator for the Northland Coop;[5] a social services representative; the Elementary School Principal; together with Dreschler, Salmela, and Jensen.

Under the IEP, which Moubry signed on November 18, 1992, the Plaintiff received early childhood classroom experience, 75 minutes per week of speech therapy ("ST"), for which Dreschler was listed as the service provider, and 35 minutes per week of occupational therapy ("OT"), for which Salmela was listed as the service provider.[6] Under the IEP, the Plaintiff received ST and OT at the ECSE classroom. Notably, the IEP did not provide for physical therapy ("PT").

In November of 1992, the Plaintiff began receiving additional speech services from Carol Sazama ("Sazama"), who was the Director of the Scottish Rite Clinic at the University of Minnesota—Duluth. The Scottish Rite Clinic operated under a grant and, thus, did not charge for its services. Thereafter, Sazama recommended increased speech services in Duluth, which required that the Plaintiff's IEP be changed to remedy a scheduling conflict.

A renewed IEP was developed on March 2, 1993. At this meeting, Moubry advised that the Plaintiff would continue to receive services at the Clinic throughout that Summer.

There was no discussion, however, about the potential need for extended school year services, and Moubry was not informed of any such option.

The Plaintiff attended OT services only twice between March 2 and May 29, 1993. At about this same time, Moubry related her difficulties in making the appointments, which were scheduled in Ely after the Plaintiff's return from Duluth. Alternative methods of service delivery, however, were not explored.

A periodic review, which had been originally scheduled for March, was conducted on May 11, 1993. All goals and objectives were continued without change. The Plaintiff received speech services from the Clinic Director during the Summer of 1993, and throughout the 1993–1994 school year, but he received no services from the School District during the Summer of 1993.

In the Fall of 1993, Moubry discussed with Salmela the possibility of a reassessment of the Plaintiff's motor abilities. Salmela advised that a formal reassessment would not be necessary, since she would only need to rewrite the Plaintiff's goals and objectives.

The IEP team met, again, on October 1, 1993, at which time it was agreed that the Plaintiff was not making progress on his speech goals and that an alteration would be required. Individuals present at this meeting included Moubry, Bonney and Sazama. At this conference, Moubry expressed concern about the level of care that was being

4. An IEP "sets out the child's present educational performance, establishes annual and short term objectives for improvement in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Evans v. District No. 17 of Douglas County, Nebraska,* 841 F.2d 824, 827 n. 1 (8th Cir.1988). The IEP "must be reviewed, and, where necessary, revised at least once a year in order to ensure that local agencies tailor the statutorily required free appropriate public education to each child's unique needs." *Learning Disabilities Association v. Board of Education of Baltimore County,* 837 F.Supp. 717, 720 (D.Md.1993), quoting *Barnett v. Fairfax County School Bd.,* 927 F.2d 146, 150 (4th Cir.1991). In short, the IEP is the *"modus operandi"* of the IDEA. *Burlington School Comm. v. Mass. Dept. of Ed.,* 471 U.S. 359, 368, 105 S.Ct. 1996, 2001–02, 85 L.Ed.2d 385 (1985).

5. For special education purposes, the School District belongs to the Northland Coop, which provides special education services to its various member districts.

6. During the 1992–1993 school year, the Plaintiff received OT services from a Dawn Erjavic, a certified occupational therapy assistant ("COTA"). While neither occupational therapists, nor COTA's are licensed under Minnesota law, the Minnesota Department of Education requires occupational therapists to be certified by their professional association. Professional rules require a certified occupational therapist to be present when a COTA is providing services. The HO determined, and the HRO affirmed, that a certified occupational therapist was not present at all sessions in which the COTA provided services to the Plaintiff.

provided to her son in the ECSE classroom. Specifically, she was concerned that speech services were not being conducted at a scheduled time.

On October 4, 1993, Moubry visited the Plaintiff's ECSE classroom in order to monitor the provision of ST services. There, she observed Dreschler use "tongue blades"—a technique that Moubry had asked not to be used on her son. Susan Ferguson ("Ferguson"), who was the ECSE classroom teacher, felt that Moubry was being disruptive, and so informed the Elementary School Principal. Ferguson advised Moubry that she would need to provide advance notification of her visits, and she referred Moubry to the Elementary School Principal. The Principal confirmed the policy which required all visitors to sign in, and further related the importance of providing advance notification, and the District's concern that too many visits would be disruptive to the classroom experience. In response, Moubry returned to the ECSE classroom and removed her son. After his removal from the classroom, the Plaintiff visited his aunt, who resided in Madison, Wisconsin, and did not return until October 25, 1993.[7]

Thereafter, Moubry was informed that advance notification would not be required for her to visit the ECSE classroom. Moreover, Dreschler notified Moubry that she would be willing to provide speech services while the Plaintiff was receiving his Head Start instruction. Moubry responded by informing Ferguson that she would prefer to have the speech services provided in her home. Moubry also stated that she did not require the services of an occupational therapist as her son's motor abilities were being reassessed.

On November 3, 1993, the Minnesota Department of Education ("MDE") advised the School District that Moubry had filed a Complaint ("Complaint No. 472"), which alleged that the District was not implementing the IEP and that OT services had been cancelled from January through September of 1993. Her Complaint further alleged that the School District was refusing to allow her access to the ECSE classroom, and that the

Plaintiff was not progressing under the speech component of the IEP.

On November 4, 1993, Moubry informed Francis Spencer ("Spencer"), who was the Director of the Northland Special Education Cooperative, that she did not want Dreschler to provide services to her son. Contemporaneously, Bonney advised a Coop Coordinator that Moubry did not want therapists coming to her home.

On November 10, 1993, the IEP team reconvened. At that session, the Elementary School Principal told Moubry that she would not be required to have advance permission to visit her son's classroom, and further explained the requirements of signing-in her attendance at the School.

On November 17, 1993, Moubry objected to the proposed interim IEP that had been developed at the meeting of November 10. In particular, she objected to a report, which was contained in the IEP, and which recorded her son's performance on a certain test, known as "the Brigance." In Moubry's view, the results were invalid because Ferguson, who conducted the test, had no assistance from anyone who could interpret the Plaintiff's speech. Moreover, Ferguson had not administered the full Brigance, nor had she proposed, in writing, a formal reassessment to Moubry. In addition, Moubry protested certain characterizations of her son, she requested additional occupational therapy, and she sought a reassessment of her son by an occupational therapist. Moubry did not, however, object to the goals and objectives that were recited in the IEP.

The School District acceded to the OT reassessment and, on December 15, 1993, Salmela reassessed the Plaintiff. The results of that reassessment revealed that, since the Plaintiff was last tested in October of 1992, his delay had increased from 13–14 months to 17–18 months. Thereafter, on January 7, 1994, the School District deleted the objectionable characterizations from the IEP of November 18, 1993, and included the request for OT services. The interim IEP was then accepted by Moubry on January 26, 1994, but

7. At the Hearing, the Parent stated that it was her impression that she was barred from visiting the school, a prospect she found alarming and unsafe because the Plaintiff was pre-verbal.

with her continued objection to the Brigance test results.

On January 17, 1994, Moubry met with Spencer and the ECSE Coop Coordinator in order to discuss speech services. At that time, the Parent reiterated her request that Dreschler not be permitted to provide the speech services. Spencer and the ECSE Coop Coordinator concluded that Moubry also did not want the services of the speech clinician, who provided services at a neighboring school district.

On January 26, 1994, the MDE notified the School District that the Plaintiff had filed a Complaint ("Complaint No. 491"), which related to Ferguson's assessment of the Plaintiff, and which claimed that the resort to the Brigance test results, without her notice and consent, amounted to impermissible discrimination.

On February 17, 1994, an IEP conference was conducted, at which speech goals were added to the Plaintiff's IEP. Those present at this meeting included Moubry, the District Superintendent of Schools, the Coop ECSE Coordinator, the certified occupational therapist assistant, together with Dreschler, Spencer and Salmela. While Spencer was temporarily out of the room, the Coop ECSE Coordinator told Moubry that her son would not receive OT unless he was enrolled in an ECSE classroom. Whereupon, Moubry left the meeting, with her observation that a Due Process Hearing would be required under the provisions of the IDEA.

On that same day, Moubry filed a third Complaint with the MDE ("Complaint No. 499"), in which she claimed that her son's services had been discontinued. At about the same time, Moubry brought her son to visit his aunt in Madison, where he remained until March of 1994.

After discussing, with the Coop ECSE Coordinator, the statement made to Moubry, that she needed to keep her son in the ECSE classroom in order to receive OT services, Spencer informed Moubry, by letter dated February 22, 1994, that the Plaintiff would continue to receive OT, and that Ferguson would observe the Headstart class and would consult. He also indicated that a formal Due Process Hearing would be in order, and that he would initiate that process. On February 28, 1994, Spencer received Moubry's request for a Hearing.

On March 2, 1994, Moubry met with the District Superintendent and agreed upon a means by which speech services would be provided to her son. Thereafter, Dreschler incorporated a list of items that had been requested by Moubry in the IEP of February 17, 1994. On March 14, 1994, Moubry brought the Plaintiff to school in order to commence his speech services. Due to an apparent misunderstanding, which is not explained in this Record, no speech services were provided on that date.

On March 23, 1994, Spencer contacted the MDE with respect to Moubry's request for the appointment of an HO. On the next day, the Commissioner of the Minnesota Department of Education appointed Steve M. Mihalchick, a State Administrative Law Judge ("ALJ"), to act as the HO, and a Hearing was scheduled for April 4, 1994.

On March 24 and 26, 1994, Moubry met with Dreschler and Joan Kjorsvig, the School Psychologist, in order to incorporate the suggestions of the Director of the Scottish Rite Clinic into the IEP. Based upon these suggestions, a revised IEP was prepared on March 26, 1994. Notwithstanding the School District's encouragement, that she sign the IEP so as to avoid the Due Process Hearing, Moubry refused and commented that she had felt pressured.

On March 22, 1994, Moubry sought an extension of the Hearing date, in order that she could obtain legal counsel, and have the Plaintiff's aunt present. By Order dated March 28, 1994, the HO granted the Parent's request for an extension and, on April 12, 1994, the HO required the provision of extended school year services and interim services. The HO's Order of April 12 also provided for an independent assessment of the Plaintiff at public expense. As a consequence, the Plaintiff requested a continuance of the Hearing until completion of that assessment. On April 13, 1994, the School District commenced the furnishing of services, which were provided three times a week for the following five weeks, until the

Plaintiff left the District in order to visit his aunt.

By letters dated April 13 and 14, 1994, the MDE made findings in each of the three Complaints filed by the Plaintiff. As to Complaint No. 472, the MDE found that the Plaintiff had not demonstrated a lack of progress. However, in response to the additional submissions of the Plaintiff, the MDE determined that the School District had failed to provide appropriate OT services during the period from January through September of 1993, and directed the School District to consider whether compensatory education was appropriate. In all other respects, the MDE ruled in favor of the School District.

On June 24, 1994, after his return from Madison, the Plaintiff began his extended school year ("ESY") services. ESY speech services were provided by Elizabeth Harryman ("Harryman"), who was an experienced speech therapist, who had retired after 23 years of employment as a speech pathologist in the public schools, and who had served as a supervising teacher for graduate and undergraduate speech therapy students in another State. However, because Harryman did not hold a Minnesota license, Dreschler observed and monitored the provision of those speech services. In addition, the Plaintiff continued to receive OT services. The Plaintiff's Summer services lasted for approximately six weeks.

Subsequently, the School District proposed an IEP on June 21, 1994 and, again, on August 11, 1994, but neither of these were acceptable to Moubry. Following the completion of his ESY services, the Plaintiff again travelled to Madison so as to visit his aunt. On September 7, 1994, Moubry notified the School District that the Plaintiff would attend public school in the Madison School District, as she had discovered that a nationally known expert in apraxia was practicing in Madison, at the Waisman Center Phonology Clinic. As well, an elementary school, which was located in the aunt's neigh-

borhood, had a relationship with the Clinic, by which any students, who were in need of services, would be seen cooperatively by the school and by the Clinic. On September 14, 1994, the Clinic evaluated the Plaintiff and found particular problem areas. Thereafter, Moubry informed the School District that the Plaintiff would not undergo an independent evaluation which had been scheduled at the Minneapolis Children's Medical Center. The Madison School District completed an IEP for the Plaintiff on January 23, 1995, based upon its assessment of him during the period from September through December of 1994.

In the interim, on December 6, 1994, the ALJ resigned from any further participation in the case, and the Commissioner reassigned the matter to Sara Jay, as the HO. The Hearing was convened on January 17, 1995, at which time testimony was presented for a period of seven days. On April 7, 1995, the HO issued a decision which concluded that the School District had not consistently provided the Plaintiff with access to services, which were reasonably calculated to provide him with some educational benefit. In this respect, the HO determined that the District had failed to provide the Plaintiff with FAPE for a period commencing in October of 1992, and continuing through October 4, 1993. In addition, the HO ruled that the Plaintiff's IEP, for the period of February 17 through March 9, 1994, did not properly satisfy the District's obligation to provide FAPE, since the IEP had relied, in part, upon the provision of services by an outside agency. The HO concluded, however, that the School District was not responsible for its failure to provide services during the period from October 4, 1993, through March of 1994, because of Moubry's decision not to work with the School District's personnel.[8] The HO also concluded, with a limited exception, that the IEP of March 24 through 26, 1994; the IEP of June, 1994; and the IEP of August, 1994; substantially satisfied the School District's obligation to provide the Plaintiff with FAPE.[9] Next, the HO determined that the

___

8. With respect to personnel, the HO concluded that the School District had provided speech and occupational services by appropriate personnel.

9. The HO noted two deficiencies in the IEPs of March 24–26, June, 1994, and August, 1994. Specifically, she concluded that ESY was provided for only in the IEP of March 24–26, and failed

School District improperly failed to consider ESY for the Summer of 1993, and improperly relied upon an occupational therapist to assess and provide for the Plaintiff's physical therapy needs. Lastly, the HO ruled that the School District had not failed to identify the Plaintiff, consistent with its child find requirements, but the HO declined to rule on issues that were related to the monitoring system and the complaint process.

Based upon these determinations, the HO required the School District to provide the Plaintiff with compensatory education in the amount of 34 hours of individual ST, and 10 hours of OT. The HO also found that compensatory education, for ST, would be appropriate for the time period commencing on November 18, 1992, and extending through October 4, 1993. In the HO's view, compensatory OT would be appropriate for the period from March 2 through May of 1993, as had been determined by the MDE in its investigation of Complaint No. 490.

In addition, the HO reformulated the Plaintiff's IEP, based upon the goals and objectives that had been developed during the Plaintiff's speech program in Madison. Specifically, the HO ordered the School District to provide the Plaintiff with four, 30–minute, individual speech therapy sessions per week. In this respect, the HO stated that Dreschler would provide the speech services or, if the District so chose, it could provide the services through a contract with a licensed speech pathologist. The HO also restructured the Plaintiff's IEP so as to provide for an assessment, by a physical therapist, of motor skills services for a total of 120 minutes per week, for continued ESY services and, lastly, for related services that would be offered on a pull-out basis during the Plaintiff's regular educational program.

In due course, the Plaintiff appealed the HO's decision, as authorized by Minnesota Statutes Section 120.17, subd. 3b(g), and the Minnesota Commissioner of Education appointed Jerry Colglazier as the HRO. As

recognized by the HRO, the Plaintiff alleged three deficiencies in the HO's determinations. First, the Plaintiff asserted that the HO erred in finding that Moubry had refused special education services during the period from October 4, 1993, through April 12, 1994. Next, the Plaintiff alleged error in the HO's finding that the School District could use Dreschler as the Plaintiff's speech therapist and, lastly, the Plaintiff argued that the HO erred in finding that the District was not aware of his specialized needs until September 22, 1992.

The HRO heard and considered additional evidence and, on August 1, 1995, issued his decision on appeal. In his decision, the HRO, with two exceptions, affirmed the HO's determinations. As a first exception, the HRO added an additional 100 minutes per week of speech services to the IEP that had been formulated by the HO. These services were to be performed by the Waisman Clinic, if those services were available, or else, by nearly similar facilities in Minnesota, such as the Scottish Rite Clinic or the Robert Pierce Clinic. As a second modification of the HO's decision, the HRO determined that Dreschler should not perform speech services "unless and until she has received in service for providing speech services to Students with verbal apraxia." *HRO Report,* at 24. In all other respects, the HRO affirmed the HO's rulings.

Thereafter, on August 21, 1995, the School District submitted a proposed IEP, in which the Plaintiff was scheduled to receive services from Dreschler, notwithstanding the fact that she would be providing the services while she was being trained.[10]

On August 30, 1995, the Plaintiff filed this civil action, as an "aggrieved party" under the judicial review provisions of the IDEA. See, *Title 20 U.S.C. § 1415(e)(2).* In his Complaint, the Plaintiff alleges that the conduct of the School District violated the provisions of the IDEA; the protections of the Americans with Disabilities Act of 1990

to specify whether the speech services would be provided on an individual basis.

10. While not probative of any of the issues before us, in the interests of a complete history, we note

that, by letter dated January 15, 1996, we were informed that the Plaintiff was then residing in Minnesota, and that his future residential status remained uncertain.

("ADA"), Title 42 U.S.C. § 12131 et seq., as augmented by Section 504 of the Rehabilitation Act of 1973, Title 29 U.S.C. §§ 706 and 794a; the provisions of Minnesota Statutes Section 120.17; and the Minnesota Government Data Practices Act ("MGDPA"), Minnesota Statutes Section 13 et seq.

In addition, his Complaint contends that the Commissioner violated the IDEA; the provisions of Minnesota Statutes Section 120.17; and the ADA—again, as including Section 504 of the Rehabilitation Act. In specifics, the Plaintiff asserts that the Commissioner failed to properly ensure that the School District rendered appropriate IDEA services to him; that the Commissioner did not establish an effective monitoring and complaint process; and, that the Commissioner failed to develop rules that would assure that the School District would employ properly trained instructors.

On August 31, 1995, the School District filed its Motion to Dismiss the Plaintiff's Complaint for want of subject matter jurisdiction. In this respect, the District maintains that the Plaintiff is not an "aggrieved party," and that, therefore, the Court lacks jurisdiction over his IDEA claims. In addition, on September 8, 1995, the Commissioner filed its Motion to Dismiss, urging that neither the Commissioner, nor the State Board of Education, were implicated, in any way, in the immediate provision of special education services to the Plaintiff.

Thereafter, on September 18, 1995, the Plaintiff filed a Motion for Judgment on the Pleadings or, alternatively, for Summary Judgment, on his claims against both the Commissioner and the School District, under the IDEA. Lastly, on October 11, 1995, the Plaintiff has moved to supplement the Record by the incorporation of evidence that he claims is relevant to his ADA and MGDPA claims.

### III. *Discussion*

A. *The School District's Motion to Dismiss.* Premised upon Rule 12(b)(1), Federal Rules of Civil Procedure, the School District seeks to dismiss the Plaintiff's Complaint on jurisdictional grounds. As such, the District's Motion does not challenge the correctness of the HRO's decision but, rather, solely urges that we are without the requisite jurisdiction to review the Plaintiff's challenge to that decision. As should be obvious, the limited scope of the District's Motion is instrumental in delineating the narrowness of the issues that the Motion presents.

1. *Standard of Review.* Quite logically, we examine the jurisdictional issue at the outset. See, *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 95, 101 S.Ct. 1571, 1582–83, 67 L.Ed.2d 750 (1981); *Bueford v. Resolution Trust Corp.,* 991 F.2d 481, 485 (8th Cir.1993) ("Lack of subject matter jurisdiction * * * cannot be waived[;][it] may be raised at any time by a party to an action, or by the court *sua sponte,*"); *Redman v. F.A.A.,* 759 F.Supp. 1384, 1387 (D.Minn. 1991). As Rule 12(b)(1) clearly allows, a party may properly raise a jurisdictional defense prior to the filing of an Answer on the merits of the Plaintiff's claims.

This sequencing of the pleadings is consistent with the core truth that "federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Marine Equipment Management Co. v. United States,* 4 F.3d 643, 646 (8th Cir.1993), citing *Bender v. Williamsport Area School District,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986), citing in turn *Marbury v. Madison,* 1 Cranch 137 [5 U.S. 137], 2 L.Ed. 60 (1803). A Federal Court, therefore, has a primordial duty, in every case before it, to inquire whether the vital prerequisite of subject matter jurisdiction has been satisfied. *Bradley v. American Postal Workers Union, AFL–CIO,* 962 F.2d 800, 802 n. 3 (8th Cir.1992); *Thomas v. Basham,* 931 F.2d 521, 523 (8th Cir.1991); *Woodke v. Dahm,* 873 F.Supp. 179, 185 (N.D.Iowa 1995), aff'd, 70 F.3d 983 (8th Cir. 1995). Moreover, as subject matter jurisdiction is a threshold consideration, the Court has "broader power to decide its own right to hear the case than it has when the merits of the case are reached." *Bellecourt v. United States,* 994 F.2d 427, 430 (8th Cir.1993), quoting *Osborn v. United States,* 918 F.2d 724,

729 (8th Cir.1990), cert. denied, 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994).

■ In order to properly dismiss an action under Rule 12(b)(1), the challenging party must successfully attack the Complaint, either upon its face or upon the factual truthfulness of its averments. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir.1993); *Osborn v. United States*, supra at 729 n. 6. Where, as here, a defendant mounts a facial challenge to jurisdiction, all of the factual allegations, which concern the jurisdictional issue, are presumed to be true, and the Motion will find success if the plaintiff has failed to allege an element necessary for subject matter jurisdiction. *Titus v. Sullivan*, supra at 593, citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731–32 (11th Cir.1980); *Woodke v. Dahm*, supra at 186; *Wittmann v. United States*, 869 F.Supp. 726, 729 (E.D.Mo.1994).

2. *Legal Analysis.* Contending that the Plaintiff has not been "aggrieved" by the HRO's decision, the School District doubts our jurisdiction to entertain the Plaintiff's IDEA claims. As to the Plaintiff's ADA claim, the School District asserts that the Plaintiff has failed to exhaust his administrative remedies, which is a condition precedent to our review. In addition, the District urges that we decline to exercise our supplemental jurisdiction over the Plaintiff's MGDPA claim. We address each of these contentions, in turn.

■ a. *The Plaintiff's IDEA claims.* As plainly enunciated in Title 20 U.S.C. § 1415(e)(2), only a "party aggrieved by the findings and decision shall have the right to bring a civil action." Accordingly, the right to bring a Federal suit, under the IDEA, extends only to those persons who are aggrieved by a final agency action. Arguing that the Plaintiff prevailed in the administrative proceedings, the School District contends that he lacks the requisite standing to mount an IDEA claim. Although we agree with the District, that the Plaintiff obtained a generally favorable result during the administrative processing of his claim, we conclude that he qualifies, as an aggrieved party, since he contests those aspects of the administrative rulings which were found against him, and for which he has requested relief. See,

*Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 814 (4th Cir.1988) (shortcomings between the relief requested, and the relief received at the administrative level, render the plaintiff an aggrieved party); *Slack v. State of Del. Dept. of Public Instr.*, 826 F.Supp. 115, 120 (D.Del.1993) ("Other courts faced with similar partial victories have found plaintiffs aggrieved parties.").

In contrast to the District's position, the Plaintiff claims that he is "aggrieved" in the following four respects:

1. The HRO's refusal to disqualify Dreschler as a provider of speech services to the Plaintiff;

2. The School District's post-Hearing failure to implement the HRO's Order that Dreschler not provide services until she has received proper training;

3. The HRO's determination not to award compensatory education for the October, 1993 through April, 1994 period, and the 1994–1995 school year; and

4. The HRO's refusal to review the monitoring and complaint system.

In view of the District's facial challenge to the jurisdictional pinions of the Plaintiff's Complaint, we accept, as true, all of the Plaintiff's allegations of jurisdictional fact. We turn, therefore, to the bases for the Plaintiff's claimed "aggrieved" status.

1) *The District's Refusal to Remove Dreschler.*

Our analysis commences with the HRO's refusal to remove Dreschler as the Plaintiff's provider of speech services. Of necessity, we are obliged to determine whether the authority of a Court, to remove a service provider, is contemplated by the IDEA. If not—as the District contends—then our jurisdiction falls short of providing the remedy that the Plaintiff requests. We conclude, however, that we are not jurisdictionally powerless to grant the relief that the Plaintiff evokes. Of course, for these purposes, we accept the Plaintiff's allegations that Dreschler failed to abide by the decisions of the IEP team, failed to follow procedural safeguards, and

failed to show that the Plaintiff made progress under her instruction.[11]

■ Under the IDEA, a Federal Court has the power to "grant such relief as [it] determines is appropriate." *Title 20 U.S.C. § 1415(e)(2)*. As a result, " 'equitable considerations are relevant in fashioning relief' and the court enjoys 'broad discretion' in so doing." *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 16, 114 S.Ct. 361, 366 (1993), quoting *Burlington School Comm. v. Mass. Dept. of Ed.*, 471 U.S. 359, 374, 369, 105 S.Ct. 1996, 2004–05, 2002, 85 L.Ed.2d 385 (1985). In *Burlington*, the Supreme Court explained that the reviewing Court had broad discretion in fashioning relief which was "appropriate in light of the purpose of the Act." *Burlington School Committee*, supra at 369, 105 S.Ct. at 2002. Not surprisingly, appropriate relief is that relief which is designed to ensure that the student is appropriately educated within the meaning of the IDEA. *Parents of Student W. v. Puyallup School District No. 3*, 31 F.3d 1489, 1497 (9th Cir.1994).

In support of its Motion to Dismiss, the School District argues, albeit without supporting authority, that we do not enjoy any greater authority over the assignment of individual service providers than that held by the administrative officers. We disagree. As recently confirmed by the Supreme Court, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 70–71, 112 S.Ct. 1028, 1035–36, 117 L.Ed.2d 208 (1992) (monetary damages available in an action to enforce Title IX). Accordingly, "[w]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Id.*, at 66, 112 S.Ct. at 1033, citing

*Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 776–77, 90 L.Ed. 939 (1946).

We find no suggestion, let alone a "clear direction," to rebut the general presumption that all appropriate relief is available for our deployment, under the IDEA. The Senate Conference Report simply states that Courts can grant "all appropriate relief." *S.Rep. No. 94–455, 94th Cong., 1st Sess. 50* (1975). One Court has interpreted this legislative expression of purpose as reflecting Congress's intent that "a district judge could adopt the program offered by the school district or the program advocated by the parents, or that he could take any other action and devise any program which in his view would ensure an appropriate individualized educational program." *Anderson v. Thompson*, 658 F.2d 1205, 1211–1212 (7th Cir.1981); see also, *W.B. v. Matula*, 67 F.3d 484, 494 (3rd Cir.1995) (finding nothing in the text or history of IDEA which precludes a Federal Court from awarding monetary damages in a Section 1983 action to enforce the IDEA).

We draw additional support, for a broad interpretation of the phrase "appropriate relief," from the Supreme Court's reasoning in *Honig v. Doe*, supra. There, the Court rejected a State's argument that there should be a "dangerousness" exception to the IDEA's requirement that a child remain in his or her current placement pending the outcome of an IDEA proceeding. The Court reasoned that school officials had adequate authority to deal with a "truly dangerous child," by "invok[ing] the aid of the courts under § 1415(e)(2), which empowers courts to grant any appropriate relief." *Id.*, at 326, 108 S.Ct. at 605–06. The Court concluded that the relief, which a Court is authorized to grant under Section 1415(e)(2), included the issuance of an injunction so to remove a student from his or her school environment.

■ Notwithstanding these authorities, the District underscores that decisions,

---

**11.** Although not relevant to the disposition of this Motion, the HO and the HRO each distinguished between the services provided, and the personnel who provided those instructional services. Specifically, each found the District's instructional personnel were appropriate, but that the services, which were provided to the Plaintiff, did not provide an appropriate instructional program. Notwithstanding his finding, that the District personnel were appropriate, the HRO, without apparent explanation, concluded that Dreschler should not perform speech services until she had received training in apraxia.

as to who should provide any particular special educational services, are exclusively rendered by the School District. We do not wholly disagree for, "once a Court determines that the requirements of the IDEA have been met, questions of methodology are for resolution by the States." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* 458 U.S. 176, 208, 102 S.Ct. 3034, 3052, 73 L.Ed.2d 690 (1982). Indeed, it is well-settled that an appropriate public education does not require the absolutely best, or any "potential maximizing" of the educational benefit for the disabled child. *Gregory K. v. Longview School Dist.,* 811 F.2d 1307, 1314 (9th Cir.1987). Rather, the program provided by the School District need only be "reasonably calculated to enable the child to receive educational benefits." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley,* supra at 207, 102 S.Ct. at 3051. Here, however, we must assume, without deciding, that the IDEA has not been satisfied and, further, that any deficiencies in the Plaintiff's instructional experience are due to Dreschler.

Under these circumstances, we conclude that, within the context of the IDEA, a Court is not precluded from directing a School District to employ a different instructor to provide special educational services to a disabled student. To hold otherwise would be to place an unintended restriction on IDEA's clear mandate—namely, to ensure that all disabled students be provided a free appropriate public education, "by grant[ing] such relief as the Court determines is appropriate." *Title 20 U.S.C. § 1415(e)(2).* There-

fore, we conclude that, arguably, the Plaintiff has been "aggrieved" by the HRO's refusal to disqualify Dreschler as a service provider, and we recommend that the School District's Motion to Dismiss, as to this claim, be denied. Of course, in so concluding, we do no more than hold that this aspect of the Plaintiff's IDEA claim is not meritless as a matter of law.[12]

2) *The District's Purported Failure to Implement the HRO's Ruling that Provisionally Disqualified Dreschler.*

Next, the Plaintiff claims to be "aggrieved" because of the School District's failure to implement the HRO's Order so as to preclude Dreschler from providing speech services "unless and until she has received in service for providing speech services to students with verbal apraxia." *HRO Report,* p. 24. After the HRO issued his decision, the District submitted an IEP, which stated in part, that Dreschler would receive training "before and while working" with the Plaintiff. In practical effect, the Plaintiff seeks an enforcement of the administrative decision below.

In the School District's view, the IDEA does not contemplate an action to enforce an administrative decision—a proposition with which we agree.[13] We note, however, that the reason enforcement is not contemplated under the IDEA is because jurisdiction under that Act is limited to parties who are aggrieved by an administrative decision. See, *Robinson v. Pinderhughes,* 810 F.2d 1270, 1273 (4th Cir.1987) (IDEA

---

**12.** We would anticipate that, in all likelihood, only on rare occasion, could a Plaintiff establish that an individual instructor was not only the cause of the disabled student's inability to progress, but also the causative factor in preventing that student from obtaining an appropriate education in the future, so as to warrant a Court's intrusion upon a School District's undeniably strong interest in selecting instructors who are most suitable to a disabled student's needs. Similarly, we suspect that the availability of alternative remedies, such as compensatory education, or in-service training for instructors, would render the removal of a given teacher as a most extraordinary remedy. See, *Campbell v. Talladega Cty. Bd. of Educ.,* 518 F.Supp. 47, 56 (N.D.Ala.1981) (ordering school system to provide appropriate "training to [student's] teacher and to the special education coordinator").

**13.** This does not mean, however, that final, administrative decisions are never enforceable. Minnesota Rule 3525.4700 allows parents to notify the Commissioner of the Department of Children, Families and Learning, if a School District fails to implement a final administrative decision, in order that appropriate sanctions may be imposed to rectify any intentional or inadvertent oversight. Alternatively, a parent may seek to enforce an administrative decision pursuant to Title 42 U.S.C. § 1983. *Reid v. Board of Education, Lincolnshire—Prairie View School District 103,* 765 F.Supp. 965, 969 (N.D.Ill.1991) (granting Motion to Dismiss enforcement claim brought under the IDEA, but permitting Plaintiff to amend Complaint to state a claim pursuant to Section 1983).

does not provide jurisdiction to enforce administrative orders, since access to the Courts is provided only to review adverse administrative orders); *Slack v. State of Delaware Department of Public Instruction*, supra at 120; *Grace B. v. Lexington School Committee*, 762 F.Supp. 416, 418 (D.Mass. 1991).

As a preliminary observation, we note the incongruity presented by the Plaintiff's simultaneous petition to enforce the HRO's decision with respect to Dreschler while, at the same time, challenging the propriety of that decision. At least at this juncture, we have concluded that our jurisdiction, to address Dreschler's assignment to instruct the Plaintiff, is not wanting, and we have not been asked by any party to determine, on the Record presently before us, whether a program, which includes Dreschler as an instructional provider, is "reasonably calculated to enable the child to receive educational benefits." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, supra.

As best as we can surmise—because it is not directly alleged anywhere—the Plaintiff seeks enforcement of the HRO's decision, as it relates to Dreschler, in the event that this Court should conclude, in its ultimate review on the merits, that an IEP which includes Dreschler is appropriately calculated to provide him with educational benefit. As so understood, the Plaintiff's claim is fundamentally flawed, for it impermissibly seeks protection from what, at this point, is only an anticipatorily adverse ruling by this Court. Since, on this enforcement claim, we find that the Plaintiff is not an "aggrieved party," we recommend that this aspect of his claim be dismissed.

3) *The HRO's Decision Not to Award Compensatory Education for the period from October of 1993, Through April of 1994, and during the whole of the 1994–1995 School Year.*

 The Plaintiff contends that he is aggrieved by the HRO's refusal to award compensatory education for the period from October of 1993, through April of 1994, and because the HRO failed to award relief for the whole of the 1994–1995 school year. Of course, it is well-settled that Federal Courts have the authority to award tuition reimbursement for private school expenses, and for compensatory education. In *Burlington School Comm. v. Mass. Dept. of Ed.*, supra at 369, 105 S.Ct. at 2002, the Supreme Court held that the Courts' authority to grant relief, under the IDEA, "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Id.* Similarly, in *Miener v. Missouri*, 800 F.2d 749, 754 (8th Cir.1986), our Court of Appeals extended the rationale in *Burlington* to support an award of compensatory education so as to insure that a parent, who could not afford to unilaterally place her child in a private educational setting, would have a viable remedy should her child be deprived of an education under the IDEA.

 As noted, the HRO determined that the District was not obligated to compensate the Plaintiff for the period, from October of 1993, through April of 1994, because Moubry unilaterally removed the Plaintiff from his educational program, and later refused Dreschler's services. Unquestionably, we have the requisite jurisdiction to review this determination of the HRO. Indeed, at the Hearing in this matter, the School District conceded that, with respect to the period from October through April, the Plaintiff is, arguably, an "aggrieved party."

 On the contrary, however, insofar as the Plaintiff claims to be aggrieved by the HRO's determination as to the 1994–1995 school year, we find his claim to have no legal merit. The purpose of compensatory education is to replace lost educational services. See, *Miener v. State of Missouri*, supra. During the 1994–1995 school year, however, the Plaintiff was enrolled in the Madison School District and, notably, he advances no claim that the services, which he received there, were less than appropriate.

 In addition to compensatory education, the Plaintiff seeks to be reimbursed for the costs that were related to his stay in Madison, inclusive of his travel and telephone

expenses. Nevertheless, we need not here decide whether such reimbursement expenses, which are generated by a disabled student's instruction in another public school system, are compensable under the IDEA, for we conclude that this issue has been waived by the Plaintiff's failure to preserve the claim at the administrative level.[14] See, e.g., *David D. v. Dartmouth School Committee*, 775 F.2d 411, 424 (1st Cir.1985) ("for issues to be preserved for judicial review they must first be presented to the administrative hearing officer"), cert. denied, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986); *Carey v. Maine School Administrative Dist. No. 17*, 754 F.Supp. 906, 921 (D.Me.1990).

As a consequence, we conclude that the Plaintiff is "aggrieved" to the extent that the HRO declined to award compensatory education for the period from October of 1993, through April of 1994 and, to that extent, we recommend that the School District's Motion be denied. We further recommend, however, that the Plaintiff's claim for reimbursement expenses, which are related to the 1994–1995 school year, be dismissed as legally barred.

4) *The HRO's Claimed Refusal to Review the Commissioner's Monitoring and Complaint Review System as it Relates to the School District.*

Lastly, the Plaintiff claims to be "aggrieved" because the HRO concluded that he lacked jurisdiction to review the Board's monitoring of the School District. Since the Plaintiff's claim, as it relates to the monitoring and complaint process, directly involves the Commissioner as opposed to the School District, we will address this issue in the framework of the Commissioner's Motion to Dismiss.

14. As the HRO explained:
Several issues stated by the Parent as issues for hearing on January 5, 1995, were not covered as issues in the Post–Hearing Brief. The hearing officer understands from these omissions that those requests have been dropped. Most related to reimbursement of the Parent; it became apparent during hearing that, to the extent costs were involved, costs have been borne by another agency. No evidence regarding unreimbursed costs to the Parent was presented.

b. *The Plaintiff's Non–IDEA Claims.* In addition to his core claim under the IDEA—namely, that additional relief is essential in order to provide him an educational program from which he can benefit—the Plaintiff has also alleged that the School District violated the protections of the ADA, and of the MGDPA.

■ 1) *The ADA Claim.* As a preliminary observation, we have no doubt that viable claims can be asserted against a School District under the ADA, either separately, or in conjunction with an IDEA claim. *Petersen v. Hastings Public Schools*, 31 F.3d 705, 708 (8th Cir.1994); *Digre v. Roseville Schools Ind. D. No. 623*, 841 F.2d 245, 249–50 (8th Cir.1988). While that has not always been the case, Congress has left no doubt as to its intention to allow such claims to proceed in tandem with an IDEA claim. See, *Smith v. Robinson*, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468–69, 82 L.Ed.2d 746 (1984) (Section 1983 and equal protection claims preempted by IDEA), overruled by *The Handicapped Children's Protection Act of 1986*, Pub.L. No. 99–372 § 3, 110 Stat. 796 (1986). By an amendment, in 1986, the IDEA was modified to read as follows:

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791, et seq.], or other Federal statutes protecting the rights of handicapped children and youth, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

*HRO Report*, p. 3 n. 1.
Consequently, the Plaintiff's failure to preserve the reimbursement issue was not the result of the HRO's refusal to hear evidence on the reimbursement claim, but because of the Plaintiff's election not to pursue such relief. Cf., *Parents of Student W. v. Puyallup School District No. 3*, 31 F.3d 1489, 1496 (9th Cir.1994) (parents of disabled child held not to have waived request for compensatory education in light of hearing officer's refusal to hear evidence on the issue).

*Title 20 U.S.C. § 1415(f).*

Our Court of Appeals has held that this Section was designed to reestablish the statutory rights that "were repealed by the U.S. Supreme Court in *Smith v. Robinson.*" *Digre v. Roseville Schools Ind. D. 623,* supra at 250, quoting *Mrs. W. v. Tirozzi,* 832 F.2d 748, 754 (2d Cir.1987).

■ The exhaustion requirement of Section 1415(f), however, precludes litigants from circumventing the Act's procedural requirements by bringing a related claim under a different Federal statute. *Mrs. W. v. Tirozzi,* supra at 756 ("[W]hen parents choose to file suit under another law that protects the rights of handicapped children—and the suit could have been filed under the [IDEA]—they are first required to exhaust the [IDEA's] remedies to the same extent as if the suit had been filed originally under the [IDEA's] provisions."); see also, House Report at 7 ("parents alleging violations of section 504 * * * are required to exhaust administrative remedies before commencing separate actions in court where exhaustion would be required under [IDEA]"). This exhaustion requirement "permits states and local agencies to employ their educational expertise, 'affords full exploration of technical educational issues, furthers development of a complete factual record and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.'" *Hope v. Cortines,* 872 F.Supp. 14, 19 (E.D.N.Y.1995), aff'd, 69 F.3d 687 (2d Cir.1995), quoting *Hoeft v. Tucson Unified School District,* 967 F.2d 1298, 1303 (9th Cir.1992).

Here, the School District contends that the Plaintiff has failed to exhaust his available administrative remedies. However, since the Plaintiff has obtained a final decision on the District's provision of FAPE through the IDEA administrative process, and because it would be futile to require the Plaintiff to exhaust the administrative process with respect to a non-FAPE, ADA claim, we are not persuaded by the District's argument.

■ For dismissal, the District relies upon the similarity between the Plaintiff's IDEA and ADA claims. As it is alleged in the Complaint, the fulcrum of the Plaintiff's ADA claim is the District's asserted denial of "access to the same benefits and programs of services provided to nondisabled children, or children with other kinds of disabilities." *Complaint,* p. 11.[15] While there appears to be some overlap in the respective contentions, at this preliminary stage, we are hesitant to presume a perfect correlation in the relief the Plaintiff seeks under each statutory framework.

■ Rather, we regard the District's exhaustion argument as misplaced, since we already have the benefit of a fully developed Record, albeit restricted to whether the Plaintiff was provided with FAPE. Ordinarily, exhaustion is required when the expertise of an administrative hearing officer is necessary in order to develop a factual record.

---

**15.** In pertinent part, the Complaint alleges that this Court has jurisdiction pursuant to the ADA, "incorporating Section 504 of the Rehabilitation Act of 1973." While the IDEA creates an affirmative duty, on the part of school districts, to provide FAPE to all disabled students, the ADA, as well as Section 504, are phrased as negatively-voiced proscriptions against disability discrimination. Section 12132 provides, in part:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*Title 42 U.S.C. § 12132.*

Section 504 of the Rehabilitation Act of 1973 is similarly worded:

No otherwise qualified individual with a disability in the United States * * * shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance * * *.

*Title 29 U.S.C. § 794(a).*

Although the express language of Section 504 is silent as to FAPE, implementing regulations require School Districts to provide "a free, appropriate public education to each qualified handicapped person who is in the [District's] jurisdiction." *Title 34 C.F.R. § 104.33(a).* Moreover, the Office of Civil Rights has interpreted the ADA regulations as requiring School Districts to provide FAPE to the same extent as required under Section 504. *Madera Unified School District,* 22 IDELR 510, 511 (OCR 1995).

*Lester H. By Octavia P. v. Gilhool,* 916 F.2d 865, 869 (3rd Cir.1990), cert. denied, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Where, as here, the Plaintiff has exhausted the IDEA's administrative procedures, Section 1415(f) does not require the Plaintiff to pursue further administrative proceedings so as to maintain a claim, under another Federal Statute, that he was not provided with FAPE. To do so what mandate a truly fruitless act.

On the other hand, to the extent that the Plaintiff's ADA claim is not a mere reiteration of his IDEA claim, exhaustion would be futile, since the administrative hearing officers lack jurisdiction to decide non-FAPE, discrimination claims. See, *C.B. v. Kasson–Mantorville,* 22 IDELR 380, 383 (SEA MN 1994). In this respect, it has long been settled that plaintiffs need not exhaust the procedures set forth in Section 1415 where resort to the administrative process would be either futile or inadequate. See, e.g., *Honig v. Doe,* supra at 327, 108 S.Ct. at 606 (1988) ("parents may by-pass the administrative process where resort to this process would be futile or the available remedies would be inadequate"); *Digre v. Roseville Schools Ind. D. 623,* supra at 250 n. 3. The futility exception to the exhaustion requirement seems particularly pertinent where, as here, the purported violation cannot be adjudicated at the administrative level. Accordingly, we recommend that the School District's Motion to Dismiss the Plaintiff's ADA claim be denied at this juncture.[16]

2) *The MGDPA Claim.* As to the Plaintiff's MGDPA claim, the District commends us to withhold an exercise of our supplemental jurisdiction. Relying on the reasoning of *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the District contends that a ruling on this State law claim is needless and, therefore, should be avoided, both as a matter of comity and so as to promote justice between the parties. We disagree.

In 1990, Congress codified the common law rules of pendent jurisdiction into the

amalgam of "supplemental jurisdiction." *Title 28 U.S.C. § 1367; Craig Lyle Ltd. Partnership v. Land O' Lakes, Inc.,* 877 F.Supp. 476, 485 (D.Minn.1995) (test in *Gibbs* has been codified in Section 1367). As so codified, Section 1367(a) confers supplemental jurisdiction over all claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Accordingly, supplemental jurisdiction exists when the Federal claim has sufficient substance to confer subject matter jurisdiction on the Court, and the State and Federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* supra at 725, 86 S.Ct. at 1138. In determining whether the State and Federal claims are sufficiently related, the Seventh Circuit recently observed that "[a] loose factual connection between the claims is generally sufficient." *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir.1995); see also, *Travelers Insurance Co. v. Intraco, Inc.,* 163 F.R.D. 554, 557 (S.D.Iowa 1995) ("The essential question is whether the claims are so related that the parties would ordinarily be expected to resolve them in one proceeding.").

While Section 1367(a) affirmatively bestows supplemental jurisdiction upon the Federal Courts, subsection (c) allows the Courts to decline to exercise this jurisdiction if one of the following four conditions is met:

1. The claim raises a novel or complex issue of State law,

2. The claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

3. The district court has dismissed all claims over which it has original jurisdiction, or

4. In exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Title 28 U.S.C. § 1367(c).*

As a consequence, if we conclude that the Plaintiff's State law claim "form[s] part of

---

**16.** As we have noted, we are loath to presume that the Plaintiff's IDEA and ADA claims are coterminous in the relief they seek and, therefore, we must await a fuller explication of those claims, before they may be properly evaluated for their duplicitousness.

the same case or controversy" as the Federal claims, we are obliged to exercise supplemental jurisdiction in the absence of a defined exception. *McLaurin v. Prater*, 30 F.3d 982, 985 (8th Cir.1994) (Absent presence of circumstances for which statute expressly granted discretion to reject supplemental jurisdiction, "section 1367(a) requires the district court to accept supplemental jurisdiction over the state-law claims."); see also, *Executive Software v. U.S. District Court*, 24 F.3d 1545, 1556 (9th Cir.1994) (same); *Habiger v. City of Fargo*, 905 F.Supp. 709, 722 n. 18 (D.N.D.1995), citing *McLaurin v. Prater*, supra.

■ As described in the Plaintiff's Memorandum in Opposition to the District's Motion to Dismiss, the State law claim is premised upon an allegedly unauthorized release of educational data, and upon the failure of the District to implement a data practices policy. Specifically, the Plaintiff contends that he was denied educational services for the period from October of 1993, through April of 1994, as a result of a conversation between Bonney and an employee of the School District, in which Bonney advised that Moubry did not want educational services to be provided in the Plaintiff's home. Since the IDEA claim necessitates an inquiry into why educational services were not provided to the Plaintiff, during the October through April period, we find that the IDEA and MGDPA claims derive from a common nucleus of operative facts. See, *HRO Report*, p. 21 ("During [relevant period], the Student did not receive services based on the Parent's preference not to work with the District's personnel."). While different legal theories are involved, each claim will require a similar evidentiary review, at least as to the period in which services were not provided.

Having determined that supplemental jurisdiction exists, we are obligated to exercise that jurisdiction unless one of the four exceptions, that are listed in Section 1367(c), should apply. *McLaurin v. Prater*, supra. We conclude that none of the exceptions apply. The Plaintiff's State law claim is neither novel nor complex, and its dimensions will not predominate over the Federal issues involved in this case. *Title 28 U.S.C. § 1367(c)(1) and (2)*. Moreover, we do not find any exceptional circumstance that would compel us to forego the exercise of that jurisdiction. *Title 28 U.S.C. § 1367(c)(4)*. Here, in addition to the IDEA and MGDPA claims, the Plaintiff seeks to prosecute an ADA claim which, in all likelihood, will entail our consideration of issues that were not fully addressed in the course of the administrative proceedings. As a result, while the Court may be able to render Judgment on the Plaintiff's core claim without the receipt of additional evidence, judicial economy and efficiency will not be threatened—and should be enhanced—by our exercise of jurisdiction over the MGDPA claim. Cf., *Moye v. Special School District No. 6*, 22 IDELR 852, 853 (D.Minn. May 2, 1995) (judicial economy and efficiency are served by permitting Plaintiff to assert non-FAPE, discrimination claims in IDEA review proceeding). Therefore, we recommend that the District's Motion to Dismiss the Plaintiff's MGDPA claim be denied.

B. *The Commissioner's Motion to Dismiss*. Relying upon Rule 12(b)(6), Federal Rules of Civil Procedure, the Commissioner urges a dismissal of the Plaintiff's action for the "failure to state a claim upon which relief can be granted." A Rule 12(b)(6) Motion to Dismiss requires the Court to review only the pleadings to determine whether the pleadings state a claim upon which relief can be granted.[17]

---

17. However, where "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Rule 12(b), Federal Rules of Civil Procedure*. Here, although materials have been offered in support of the Commissioner's Motion, we have not relied upon those materials in our consideration of the dismissal Motion. See, *Skyberg v. United Food and Commercial Workers Intern. Union*, 5 F.3d 297, 302

n. 2 (8th Cir.1993) (A Court has wide discretion in electing to consider matters outside the pleadings on Motions to Dismiss). Therefore, the Commissioner's Motion will not be treated as one for Summary Judgment. However, because we find that the Plaintiff has stated a claim for which relief can be granted as to his direct services claim, we will review the documentary submissions, in the context of the Plaintiff's Motion for Summary Judgment and, to that extent, we treat the Commissioner as having cross-

1. *Standard of Review.* In considering a Motion to Dismiss under Rule 12(b)(6), Federal Rules of Civil Procedure, we accept as true, in a hypothetical sense, all of the factual allegations of the Plaintiff's Complaint, and we view those allegations in a light most favorable to the Plaintiff. See, *Patterson v. Von Riesen,* 999 F.2d 1235 (8th Cir.1993); *Schibursky v. International Business Machines Corp.,* 820 F.Supp. 1169, 1175 (D.Minn.1993). Under such an analysis, it is well-established that an action may not be dismissed for failing to state a claim, unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In treating the factual allegations of a Complaint as true, the Court "do[es] not, however, blindly accept the legal conclusions drawn by the pleader from the facts." *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990), citing *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

2. *Legal Analysis.* The Commissioner argues that the Plaintiff has failed to state a cognizable claim that warrants relief. In the Commissioner's view, the Plaintiff's Complaint asserts, against the interests he represents, the following claims:

1. The Commissioner failed to ensure that the Plaintiff received special educational services from October of 1993, through April of 1994;

2. The Commissioner did not establish an effective monitoring and complaint process; and

3. The Commissioner failed to develop rules which would ensure that the School District employed appropriately trained personnel.

With the exception of the Plaintiff's claim, that the Commissioner failed to ensure special education services, we agree with the Commissioner, that the Plaintiff has failed to state a claim upon which relief can properly be granted.[18]

In addressing this issue, we accept that the Commissioner, as the State Educational Agency ("SEA"), bears the ultimate responsibility for ensuring that all eligible students are provided with a free, appropriate public education. See, *Title 20 U.S.C. § 1412(6);* [19] see also, *Todd D. by Robert D. v. Andrews,* 933 F.2d 1576, 1582 (11th Cir.1991); *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 696–97 (3rd Cir.1981); *Straube v. Florida Union Free School District,* 801 F.Supp. 1164, 1179 (S.D.N.Y.1992); *Cordero by Bates v. Pennsylvania Department of Education,* 795 F.Supp. 1352, 1362 (M.D.Pa.1992) (The State's role amounts to more than "creating and publishing some procedures and then waiting for the phone to ring."). In *Kruelle,* the State Department of Education argued that, under the IDEA, it functioned "solely as a supervisory agency" and, therefore, it should not be held responsible for coordinat-

moved for Summary Judgment on the direct services issue.

**18.** While the Commissioner argues for a dismissal of the Plaintiff's IDEA-based claims, he assumes, without argument, that our grant of his Motion would necessarily entail the dismissal of the Plaintiff's ADA claims. See, *Commissioner's Reply Memorandum Relative to Its Motion to Dismiss,* at 3 n. 3. Of course, such an assumption would only hold true if the Plaintiff's ADA claims should precisely parallel his claims under the IDEA. To the extent that the Plaintiff's ADA claim may be seen as alleging a claim of discrimination premised upon the qualifications of educational personnel, or upon the establishment of a State facility which would be devoted to children suffering from apraxia, the Plaintiff has sufficiently differentiated his ADA claim, from his IDEA action, to survive the Commissioner's Motion to Dismiss. We conclude, however, that the

Plaintiff has failed to distinguish his claim concerning the monitoring and complaint process and, therefore, for reasons we address in the text of this Report, we recommend that the Commissioner's Motion to Dismiss be granted as to that aspect of the Plaintiff's claim, whether arising out of the IDEA or the ADA.

**19.** Title 20 U.S.C. § 1412(6) provides, in pertinent part:

The State educational agency shall be responsible for assuring that the requirements of this subchapter are carried out and that all educational programs for handicapped children within the State, including all such programs administered by any other State or local agency, will be under the general supervision of the persons responsible for educational programs for handicapped children in the State educational agency and shall meet education standards of the State educational agency.

ing efforts to develop an IEP for an individual student. In rejecting this argument, the Court examined the legislative history of the Act, and determined that Congress intended the SEA to be the "central point of accountability." *Id.*, at 697, citing *S.Rep. No. 168, 94th Cong., 1st Sess. 24* ("[T]he responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.").

▪ Consistent with this oversight responsibility, the Commissioner, in his capacity as the SEA, can demand compliance from the local School Districts and, when compliance is not forthcoming, can impose appropriate sanctions. As mandated by Section 1414(d)(1), the Commissioner is required to provide special education, and related services, directly to an eligible student whenever the Commissioner determines that the School District "is unable or unwilling to establish and maintain programs of free appropriate public education." *Title 20 U.S.C. § 1414(d)(1).*

Although the Commissioner contends that, whatever his oversight responsibility may be, he cannot be held responsible for directly providing services to individual, special education students, we disagree. Section 1414(d)(3) specifically requires direct action by the SEA when a School District "has *one* or more handicapped children who can best be served by a regional or State center designed to meet the needs of such children." *Title 20 U.S.C. § 1414(d)(3)* [Emphasis added]. In *Doe by Gonzales v. Maher,* 793 F.2d 1470, 1492 (9th Cir.1986), aff'd as modified on other grounds, 485 U.S. 305 (1988), the Ninth Circuit found it "incontrovertible that, whenever the local agency refuses or wrongfully neglects to provide a handicapped child with a free, appropriate education, that child 'can best be served' on the regional or state level." See also, *Cordero by Bates,* supra at 1363 ("The violation of even one child's rights under the Act is sufficient to visit liability on the State[;] [t]his is a proposition that has been reiterated time and again."). In view of this authority, the ultimate responsibility for FAPE, even as to one child, rests with the

Commissioner and, therefore, we recommend that his Motion to Dismiss on this ground, be denied.

Next, the Plaintiff asserts that the Commissioner failed to establish an effective monitoring and complaint process and, for relief, he requests that we "order [the Commissioner] to revise its monitoring and compliance program to ensure that Plaintiff Joe can rely upon same to protect his educational rights." *Complaint,* at 12. Since we find that the Plaintiff has failed to exhaust his administrative remedies as to this claim, we recommend that the Commissioner's Motion be granted.

▪ As to this "monitoring and complaint" claim, the Plaintiff asserts that the Commissioner has failed to maintain a complaint resolution system which complies with the IDEA Regulations that are set forth in 34 C.F.R. §§ 300.660–662, and that, as a result, he went without services for the period from October of 1993, through April of 1994. In particular, the Plaintiff contends that the Commissioner failed to promptly and adequately resolve the three Complaints that he had asserted against the School District. As we have noted, these Complaints were filed in October of 1993, January of 1994, and February of 1994.

With respect to these Complaints, the Regulations require each SEA to adopt complaint resolution procedures, which shall include a 60–day time limit to investigate the Complaint, to allow the Complainant an opportunity to submit additional information, and to issue a written decision that addresses each allegation. See, *34 C.F.R. § 300.661(a).* More importantly—at least for the purposes of this Motion—individuals, who are dissatisfied with the State's Complaint procedure, may bring an appeal to the United States Department of Education. See, *34 C.F.R. § 300.661(d)* (the SEA is required to include in its complaint resolution procedure the right of the complainant to request the Secretary to review the SEA's final decision). In this respect, the Office of Special Education Programs ("OSEP") is responsible for investigating complaints that have been lodged against an SEA. "To enforce the statute, OSEP may seek an informal resolution, begin administrative cease-and-desist

proceedings, commence proceedings to withhold funds, or request that the Justice Department initiate judicial proceedings to compel compliance." *Beth V. by Yvonne V. v. Carroll,* 876 F.Supp. 1415, 1426 (E.D.Pa. 1995); but see, *Mrs. W. v. Tirozzi,* supra at 757 (Secretary may only withhold Federal funds from a State found to be in noncompliance).

▆▆▆ As we have previously addressed, the exhaustion doctrine embodies the notion that "agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *McCarthy v. Madigan,* 503 U.S. 140, 145, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992). Here, Congress has charged the United States Department of Education with ensuring that an SEA is in compliance with the monitoring and complaint procedures, that are set forth in the IDEA Regulations. Here, it is uncontested that the Plaintiff has failed to invoke OSEP's institutional experience and judgment in evaluating the Commissioner's monitoring and complaint process.

In response to the Commissioner's exhaustion argument, the Plaintiff contends that he should not be required to exhaust his administrative remedies because OSEP cannot offer relief that is specifically tailored for his benefit. We find, however, that this contention is without merit for systemic relief is precisely the remedy that the Plaintiff has requested in his Complaint. In contrast to the expertise of this Court, which approaches educational matters as would a generalist, the Secretary brings to bear a specialized expertise in educational matters which is not commonly available to the Court in fashioning injunctive remedies. By failing to exhaust his administrative remedies, the Plaintiff has undermined this specialized process. *McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969) (The exhaustion doctrine prevents courts from undermining the administrative

process and permits an agency to bring its expertise to bear on a problem). Moreover, to the extent that the Plaintiff seeks specific relief from the Commissioner, owing to the Commissioner's failure to monitor the School District, the substance of that claim will be addressed, somewhat unavoidably, in the context of the Commissioner's obligation to provide direct services for the period from October of 1993, through April of 1994.

Therefore, we recommend that the Commissioner's Motion to Dismiss the Plaintiff's action, as it relates to the Commissioner's monitoring and complaint process, be granted. Moreover, since the Plaintiff has failed to differentiate his "monitoring and complaint" claim, as it arises out of the IDEA, from the same claim, as it is premised upon the ADA, we recommend the dismissal irrespective of the claim's statutory underpinning. See, *Christopher W. v. Portsmouth School Comm.,* 877 F.2d 1089 (1st Cir.1989) (dismissing claims under the Rehabilitation Act, and Section 1983, for failure to exhaust administrative remedies under the IDEA).

Lastly, the Plaintiff asserts that the Commissioner has failed to develop rules to ensure that the School District has retained appropriately trained personnel. As to this claim, the Complaint seeks an Order that would require the Commissioner "to develop rules concerning the qualifications of related service personnel to ensure educational benefit under the IDEA, and order that until such time as same is developed [the Commissioner] defray any costs to the local district for providing same to Plaintiff Joe." *Complaint,* at 12. In essence, the Plaintiff contends that the Commissioner's failure to promulgate rules, that would obligate related service personnel to hold licenses prior to working with handicapped students, is unlawful under the IDEA.[20]

▆▆▆ To support this argument, the Plaintiff relies upon Title 20 U.S.C. § 1413(a)(3)(A) and (B), which requires those States, which receive Federal special edu-

---

20. As the Plaintiff states the issue:
 If one is a professional providing certain related services, one apparently need not be licensed. This appears to be contrary to the IDEA.

*Plaintiff's Memorandum in Opposition to the Commissioner's Motion to Dismiss* at page 23.

cation funds, to submit a plan that includes a description of the procedures that the State will implement in order to ensure both "an adequate supply of qualified special education and related service personnel," and "that all personnel necessary to carry out this subchapter are appropriately and adequately prepared." In advancing this argument, however, the Plaintiff suffers from the misapprehension that the IDEA equates licensure with "appropriately and adequately prepared," and from the misconception that, because the Commissioner does not require related services personnel to hold licensure, he is in violation of the IDEA.

In contrast to the Plaintiff's misapprehension, the advisory notation to the IDEA Regulations, which implement Section 1413, specifically provides that "[t]he regulations do not require States to set any specified training standard, such as a master's degree, for employment of personnel who provide services." See, *Note, 34 C.F.R. § 300.153.* The note goes on to relate that, even those States whose "standards for a profession or discipline * * * are not based on the highest requirements in the State applicable to a specific profession or discipline," see, *34 C.F.R. § 300.153(c),*[21] need not "require personnel providing services under this part to apply for and obtain the license, registration, or other comparable credential required by other agencies of individuals in that profession or discipline." See, *Note, 34 C.F.R. § 300.153.* As the note makes clear, the IDEA does not obligate an SEA to enact rules concerning the licensure of related services personnel.[22]

For these reasons, we conclude that the Plaintiff's action, which challenges the qualifications of the related services personnel, fails to state a claim, under the IDEA, upon which relief can be granted, and we recommend that the Commissioner's Motion to Dismiss, as to this claim, be granted.

C. *The Plaintiff's Motion for Summary Judgment.* The Plaintiff seeks the entry of Summary Judgment on his IDEA-based claims as they relate to both the School District and the Commissioner.[23] Due to the unusual circumstances of this case, a brief summary of the IDEA review procedure is in order.

1. *Standard of Review.* In an action which challenges an administrative decision under the IDEA, the Act provides that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Title 20 U.S.C. § 1415(e)(2).* Accordingly, judicial review under the IDEA differs from a judicial review of other agency actions, in which the Courts are generally limited to the Administrative Record and are normally held to a more deferential standard of review. *Ojai Unified School District v. Jackson,* 4 F.3d 1467, 1471 (9th Cir.1993), cert. denied, 513 U.S. 825, 115 S.Ct. 90, 130 L.Ed.2d 41 (1994). Of course, if the Court's review is primarily based upon the Administrative Record, then

21. The term "highest requirements in the State applicable to a specific profession or discipline" means "the highest entry-level academic degree needed for any State approved or recognized certification, licensing, registration, or other comparable requirements that apply to that profession or discipline." *34 C.F.R. § 300.153(a)(2).*

22. If the Plaintiff seeks a licensure program enacted for all related service providers, his proper forum would appear to be the Minnesota State Legislature, for the Minnesota State Board of Education, which is charged with promulgating rules relative to qualifications of essential personnel, see, *Minnesota Statutes Section 120.17, Subdivision 3(a),* may adopt or amend its rules "only upon specific authority." *Minnesota Statutes Section 121.11, Subdivision 7(b).*

23. In the alternative, the Plaintiff has moved, pursuant to Rule 12(c), for Judgment on the Pleadings. A motion for Judgment on the Pleadings, however, may only be filed once the pleadings are closed. Rule 7(a), Federal Rules of Civil Procedure, provides that the pleadings are closed upon the filing of a Complaint and an Answer. Here, neither Defendant has filed an Answer. As a result, the Plaintiff's Motion for Judgment on the Pleadings is denied as premature. See, e.g., *Dorgan v. International Harvester Co.,* 585 F.2d 1380, 1381 (8th Cir.1978); *Geir v. Educational Service Unit No. 16,* 144 F.R.D. 680, 686 (D.Neb. 1992).

judicial review, under the IDEA, resembles the review of any other final agency decision.

In *Hunger v. Leininger,* 15 F.3d 664, 669–70 (7th Cir.1994), cert. denied, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994), the Seventh Circuit addressed the IDEA's mixing of an ordinary civil proceeding, with concepts derived from the judicial review of an administrative action, in the context of a Motion for Summary Judgment. There, the plaintiffs, who were dissatisfied with the administrative hearing officer's determination, filed suit in Federal Court, and moved for the entry of Summary Judgment. The Motion required the Court to decide "whether the administrative hearing officers below failed to apply the proper law, and failed to make findings and orders consistent with the greater weight of the evidence." The District Court granted Summary Judgment in favor of the defendant School District, even though the District had not moved for such a disposition, and notwithstanding the absence of notice to the Plaintiffs.

In affirming the grant of Summary Judgment, the Court concluded that, because neither party had requested leave to submit any evidence to the District Court, the Court was entitled to assume that the parties wanted the case decided on the basis of the Administrative Record. In the words of the Court, "[w]hen the plaintiffs in this case moved for summary judgment they gave no hint that they wanted to present evidence if the motion was denied." *Id.,* at 669.

We find the Court's reasoning in *Hunger* persuasive and, as a consequence, we focus upon the parties' stated intentions, rather than the mere labels that they have attached to their papers. As Rule 56 makes clear, Summary Judgment is appropriate if we view the facts, and the inferences to be drawn therefrom, in a light most favorable to the non-moving party, and yet find no genuine issue as to any material fact. *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 471 (8th Cir.1995). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Churchill Business Credit Inc., v. Pacific Mutual Door Co.,* 49 F.3d 1334, 1336 (8th Cir.1995); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66–67 (8th Cir.1994).

We find nothing extraordinary about the grant of Summary Judgment in an IDEA proceeding. See e.g., *Victoria L. by Carol A. v. District School Board,* 741 F.2d 369, 372 (11th Cir.1984) ("Nothing in the language or legislative history of the [IDEA] suggests that Congress intended to dispense with the 'wholesome utility' of summary judgment."). However, when the parties have not asked the Court to make a determination on the Administrative Record, based upon the preponderance of the evidence, we are proscribed from drawing findings of fact as to issues that have been disputed in the administrative proceedings. Cf., *Ojai Unified School District,* supra at 1472 (where the Court makes findings of fact on disputed issues in IDEA proceeding, it is not a "true summary judgment procedure", but a "bench trial based on a stipulated record").

2. *Legal Analysis.* With these precepts in mind, we first address the Plaintiff's Motion against the School District, and then proceed to the Plaintiff's Motion against the Commissioner.

a. *The Plaintiff's Motion for Summary Judgment as Against the School District.*

At its core, the Plaintiff seeks Summary Judgment as to those issues which the HRO found against him at the final administrative level. As we have previously detailed, the issues, which have been raised for judicial review, include the Plaintiff's request to remove Dreschler from his instructional program, together with his request for compensatory education for the period from October of 1993, through April of 1994. In addition, the Plaintiff seeks an Order that would entitle him to physical therapy by a physical therapist, and to occupational therapy by an occupational therapist.

Notably, the Plaintiff has not sought our ruling on the Administrative Record, based upon a preponderance of the evidence, on

any of these pending claims but, rather, urges a determination that is based upon the pleadings, together with the parties' written submissions. In fact, the Plaintiff has advised us that, if a determination on the Administrative Record is required, then he would request an opportunity to supplement the Record. In actuality, the milieu of the Plaintiff's Motion is just the flip-side of that presented in *Hunger*, on account of the Plaintiff's intention to submit additional evidence if he is unsuccessful, as a matter of law, in obtaining a Summary Judgment.[24]

In support of his Motion, the Plaintiff contends that there are no disputed issues of material fact because the District has adopted the HRO's Findings of Fact, as evidenced by the District's failure to appeal that decision. In effect, the Plaintiff asks this Court to adopt the factual findings of the HRO as our own, and yet reach a different legal conclusion. In response to the Plaintiff's entreaty, the District vigorously argues that issues of fact remain in dispute. Curiously, however, in its Memorandum in Opposition to the Plaintiff's Motion, the District has expressly adopted the HRO's Findings of Fact. See, *Motion by School District in Opposition to Plaintiff's Motion for Summary Judgment*, at page 4 ("By not filing an appeal at this time, the District, by implication, adopts the level II hearing officer's findings of fact."). Nevertheless, because the HRO's Findings of Fact do not lead, as a matter of law, to the conclusions urged by the Plaintiff, we recommend that the Plaintiff's Summary Judgment Motion, as against the School District, be denied.[25]

As indicated, the Plaintiff seeks an Order which would preclude Dreschler from providing the Plaintiff with speech services. Contrary to the Plaintiff's assertions, however, the HRO did not find Dreschler to be unqualified but, rather, merely noted that "while not an expert in apraxia, [she] is appropriately licensed according to standards in Minnesota Rules," and that "[s]he has had experience in dealing with apraxic children, and has many years of experience as a speech clinician." *HRO Report*, p. 27.

24. As more fully stated, the Plaintiff explains:

> If the Court determines that a review of the entire administrative record is necessary in this case, then Plaintiff Joe has, through the filing of an additional Notice of Motion and Motion advised the Court that the Plaintiff Joe may need to supplement the record, because at this time Plaintiff Joe is uncertain of the exact contents of the record. Alternatively, the Court may well be able to determine Plaintiff Joe's IDEA claim based upon the pleadings, and documents submitted with or in opposition to this motion.

*Plaintiff's Motion for Summary Judgment against the School District*, at 6.

25. Notably, the School District has not moved for Summary Judgment but, rather, argues that issues of disputed fact make the Plaintiff's Motion inappropriate. The District states further, however, that "[i]f the court goes to the merits (including disputed facts) the District is entitled to judgment [and] [t]he HRO decision should be affirmed." See, *School District's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment*, at page 10. Conceptually, therefore, the District may have decided against filing its own Motion for Summary Judgment because it believed that the Plaintiff's Motion adequately put the validity of the HRO's decision at issue.

While it can be argued that the validity of the HRO's Decision is ripe for review, we do not so conclude. Contrary to some other jurisdictions, the general rule in this Circuit is that a Court has no power to order Summary Judgment *sua sponte*. See, *Johnson v. Bismarck Public School District*, 949 F.2d 1000, 1004–05 (8th Cir.1991). In *Johnson*, the Plaintiff filed a Rule 56 Motion for an award of attorney's fees. Although the Court granted Summary Judgment against the non-moving party, the Court observed that "both parties obviously expected the district court to make a final ruling in response to [Plaintiff's] motion." *Id.* This is not the case here, because the Plaintiff has alluded to an intention to supplement the Administrative Record in the event we deny his dispositive Motions. As a result of this posturing, a "final ruling" would not appear to be anticipated by the Plaintiff. Put simply, we decline to address disputed facts in the Administrative Record at the risk of being "sandbagged". See, *Hunger v. Leininger*, 15 F.3d 664, 670 (7th Cir.1994) ("It is sandbagging to make the judge think that you want him to decide the case on the administrative record and then when he does so and rules against you ask for an opportunity for a second, an evidentiary, bite at the judicial apple."), cert. denied, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994). Since the District has chosen not to seek Summary Judgment at this time, the Plaintiff has not identified what additional facts he feels would be germane to our ultimate ruling on the merits of his claim. In order to have these additional facts in mind, however, we direct counsel for the Plaintiff to submit a written offer of proof as to that evidence which he believes would properly supplement the Record pertaining to his IDEA claims.

We understand the Plaintiff to argue, again without authority, that, because the HRO concluded that the Plaintiff did not benefit from Dreschler's instruction, she should be replaced as a matter of law. This contention is completely unfounded. Although we have previously held that, in rare instances, a Court may enjoin a teacher from working with an individual child, we also observed that the required showing would be extraordinary. Not only would the parent be required to establish that the student's failure to progress was directly attributable to the challenged instructor, but the absence of alternative, less intrusive measures, which could effectively remedy the situation, would also be required. Here, not only did the HRO fail to find Dreschler unqualified, but there is also no showing that the HRO regarded Dreschler as having been responsible for the Plaintiff's alleged failure to progress. Accordingly, we recommend that the Plaintiff's Motion, as to the removal of Dreschler, be denied.

In like fashion, we find the Plaintiff's request for compensatory education, for the period from October of 1993, through April of 1994, to be unsuitable for resolution by Summary Judgment. In this respect, the HRO concluded that the Plaintiff was not owed compensatory education as to this period, because of Moubry's preference not to work with the District's personnel. Where, as here, a disabled student is not subject to a State's mandatory attendance law, the School District's obligation, under the IDEA, is to make FAPE available in the event that the parent should elect to return the child to public schools of that District. See, *Letter of Harris*, 20 IDELR 1225 (OSEP 1993); *Minnesota Statutes Section, 120.101 Subdivision 5* (a parent may withdraw a child under the age of seven from enrollment at any time).

As pertinent to this issue, it is undisputed that, on October 4, 1993, Moubry withdrew the Plaintiff from the ECSE classroom. As explained by the HRO:

> During and immediately before this period, numerous misunderstandings arose between [Moubry] and the District. Neither [Moubry] nor the District bears all the blame for these misunderstandings; and both the District and [Moubry] changed their announced positions, causing further misunderstandings and confusion.

*HRO Report*, at 31.

Rather than point to any findings in the HRO's Decision, and then argue that the District has adopted those findings by implication, the Plaintiff appears to have selected those portions of the Administrative Record which appear to support his claim that the responsibility for the absence of service rests solely upon the District. For understandable reasons, we reject the Plaintiff's invitation to review only a portion of the Record, so as to make a determination based upon that evidence, rather than upon the entire Administrative Record as a whole.

To the extent that the Plaintiff seeks to frame the dispute as involving the location of the services, we would merely note that the HRO determined that the Plaintiff was not owed services for the time in question, because he had rejected services from Dreschler. Moreover, even with respect to the location of the services, the Plaintiff does not address the evidence which discloses that his advocate informed the District that Moubry did not want the services to be provided in her home. Accordingly, we recommend that the Plaintiff's Motion for Summary Judgment, as to this issue, be denied.

Lastly, we conclude that the Plaintiff's request for an Order, which would require the District to provide him with physical therapy from a physical therapist, and with occupational therapy from an occupational therapist, is wholly without merit. The HRO determined that services should be provided by "appropriately certified occupational therapists and/or occupational therapy assistants, working under conditions approved by their association." *HRO Report*, at 24. The Plaintiff has failed to establish, as a matter of law, that occupational therapy can only be provided by an occupational therapist.

Similarly, the Plaintiff has failed to demonstrate the absence of material facts with respect to his need to have a physical therapist provide physical therapy. Indeed, the

HRO noted that "physical therapy and occupational therapy overlap for young children" and, as a result, ordered an assessment by a physical therapist in order to determine "whether the services required under the IEP (after modification, if any) can be provided by an [occupational therapist] in combination with a [certified occupational therapist], or can only be provided by a [physical therapist]." *HRO Report*, p. 25. Since we find the existence of disputed issues of material fact, and because the parties have not placed the factual sufficiency of the HRO's Decision in issue, we recommend that the Plaintiff's Motion for Summary Judgment, as to the School District, be denied.

b. *The Plaintiff's Motion for Summary Judgment as against the Commissioner.*

By this Motion, the Plaintiff asks that we find, as a matter of law, that the Commissioner should have intervened and provided him with educational services during the period from October of 1993, through April of 1994. The Plaintiff further contends that the Commissioner's monitoring and complaint process, his parental safeguard brochure, and his failure to promulgate a clear licensure procedure, violate the IDEA as a matter of law. Since we have already determined that the Plaintiff has failed to state a claim against the Commissioner with respect to its licensure system and monitoring and complaint procedures, we direct our focus to the Plaintiff's claims that relate to the Commissioner's failure to provide direct services, and his promulgation of an assertedly deficient brochure.

■ As a preliminary matter, we note that the direct services issue is presented to the Court as cross-Motion for Summary Judgment for, in moving to dismiss under Rule 12(b)(6), the Commissioner submitted materials outside of the pleadings for the Court's consideration. The Plaintiff has been provided a full opportunity to respond to these submissions and, indeed, has conceded that "[t]he Court could consider the State's Motion to Dismiss as to the IDEA and Plaintiff's Motion for Summary Judgement as against the State as essentially cross-motions for summary judgment." See, *Plaintiff's Reply to Commissioner's Motion to Dismiss*, at pages 3–4. Since we have reviewed and relied upon the parties' documentary submissions, we apply the standards of Rule 56, Federal Rules of Civil Procedure, to our review of the direct services issue.

The crux of the direct services claim is a contention that the Commissioner purportedly knew that the Plaintiff was without services, during the period from October of 1993, through April of 1994, and yet did not take measures to ensure that services were provided. Having previously determined that the allegations sufficiently state a claim upon which relief can be granted, we must decide whether, on the uncontested evidence that has been submitted, the Commissioner was responsible for providing services under the circumstances here.

■ In *Doe by Gonzales v. Maher*, supra, the State had argued that the IDEA required it to provide direct services only when the local School District failed to maintain any special education programs. The Court rejected this assertion, and concluded that an SEA is obligated to provide direct services when the Plaintiff can establish the following three conditions:

1. a significant breach of responsibility by a local School District;

2. adequate notice by the child's parents to the responsible state officials of the local School District's noncompliance; and

3. a reasonable opportunity for the State to compel local compliance.

*Id.*, at 1492; see also, *Wilson v. McDonald*, 1986–87 EHLR 558:364 (E.D.Ky. May 15, 1987).

We find the reasoning in *Doe by Gonzales v. Maher*, supra, persuasive and, accordingly, adopt it as our own.

■ Of course, if we find that the Plaintiff is not owed compensatory education, for the period from October of 1993, through April of 1994, because the District was in compliance with the IDEA, then the Plaintiff's claim against the Commissioner necessarily fails under the first prong of the *Maher* test. Since we find material issues of fact as to the first prong, we defer an assessment of whether the Plaintiff has satisfied the

second and third prongs of the test—namely, adequate notice and reasonable opportunity to compel compliance. Accordingly, we recommend that the parties' cross-Motions for Summary Judgment be denied.

Next, the Plaintiff asserts, without benefit of cited authority, that the Commissioner's "Parent Rights and Procedural Safeguards" brochure ("Rights Brochure") was inadequate since it did not inform Moubry about "what to do to secure speech and occupational therapy services for Plaintiff Joe during a crisis." See, *Plaintiff's Memorandum in Support of Motion for Summary Judgment,* at 7. We disagree.

■ In accordance with 34 C.F.R. §§ 300.504(a) and 300.505(a)(1), before a public agency renders a determination concerning the provision of special educational services to a disabled child, the agency must provide the parents of that child with written notice, which would include a full explanation of the IDEA procedural safeguards. Here, the Plaintiff, however, does not contend that the Rights Brochure failed to explain the IDEA's procedural safeguards.[26] Instead, the Plaintiff complains that the Rights Brochure was deficient in failing to address Moubry's course of action in the context of a "crisis". We are at a loss to understand how a document, which has been found to adequately explain the IDEA procedural safeguards—a finding which does not appear disputed—is, nonetheless, in violation of the IDEA for failing to explain what to do in a "crisis." At a minimum, these safeguards, as described in the Rights Brochure, would include the right to "proceed directly to an impartial due process hearing." See, *Joint Appendix in Support of Plaintiff's Motion for Summary Judgment, Rights Brochure,* at page 5. Moreover, because it is only a pamphlet, and not a full explication of the applicable law, the brochure could not address every special education scenario, however improbable the occurrence of that scenario might be. As a necessary result, the brochure lists the addresses and the telephone numbers of organizations and agencies, in-

cluding parents' advocacy groups, and special education mediation services, with whom a parent may consult. We, therefore, recommend that the Plaintiff's Motion for Summary Judgment, as it relates to the Rights Brochure, be denied.

D. *The Plaintiff's Motion for Leave to Supplement the Record.*

By this Motion, the Plaintiff seeks to conduct discovery which would relate to his non-IDEA claims. Specifically, the Plaintiff requests leave to supplement the Administrative Record by adding information which would be relevant to his ADA and MGDPA claims.

■ 1. *Standard of Review.* In delineating the Record upon judicial review, the language of the IDEA makes clear that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Title 20 U.S.C. § 1415(e)(2).* Although phrased in a mandatory tone, the Courts have, with near uniformity, recognized the broad discretion that the reviewing Court wields in allowing any augmentation of the Administrative Record. As the Court expressed in the landmark case of *Town of Burlington v. Mass. Dept. of Ed.,* 736 F.2d 773, 790 (1st Cir.1984):

> We construe "additional" in the ordinary sense of the word, *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1980), to mean supplemental. Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as Rowley requires. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3051.
>
> A trial court must make an independent ruling based on the preponderance of the evidence, but the Act contemplates that the source of the evidence generally will be

---

26. Indeed, on June 24, 1993, OSEP informed the Commissioner that it had approved the contents of the Rights Brochure. See, *Appendix, Commis-* *sioner's Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment, Letter dated June 24, 1993.*

the administrative hearing, with some supplementation at trial. The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding.

In the absence of "solid justification" for the submission of additional evidence, the administrative hearing process would be undermined and would render meaningless Congress' admonition that the Courts ascribe "due weight" to those underlying proceedings. *Roland M. v. Concord School Committee,* 910 F.2d 983, 996, (1st Cir.1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).

2. *Legal Analysis.* As indicated, the Plaintiff seeks to supplement the Record with evidence pertaining to his ADA and MGDPA claims. By seeking to supplement the Administrative Record with non-IDEA claims, however, the concerns expressed in *Burlington School Comm. v. Mass. Dept. of Ed.,* supra, are not fully applicable. Nonetheless, because the Plaintiff has not advanced a solid justification for the receipt of supplemental evidence regarding the provision of FAPE, we conclude that the scope of discovery be limited to his claim of discrimination under the ADA, and his MGDPA claim.

■ With respect to his ADA claim, the Plaintiff wishes to conduct discovery regarding the monitoring and complaint process, and the employment of qualified personnel. Given our Recommendation, that the Plaintiff's monitoring and complaint claim should be dismissed, regardless of the Federal Statute upon which it is predicated, discovery on that issue is foreclosed. However, in light of the potential differentiation between his IDEA and ADA claims, as they would relate to personnel-related issues, we grant the Plaintiff's Motion to include a copy of the portion of the Minnesota State Plan, which concerns the State's role in the development of qualified personnel, and his request for

leave to submit ten interrogatories to the Commissioner on this issue. Likewise, we grant the Plaintiff's Motion, as it pertains to his MGDPA claim, for leave to depose the individual, who allegedly engaged in a phone conversation with the Plaintiff's advocate concerning the School District's provision of speech services in Moubry's home.

NOW, THEREFORE, It is—

ORDERED:

That the Plaintiff's Motion to supplement the Record [Docket No. 15] is GRANTED, to the extent that he seeks to add evidence concerning his claim that the qualifications of educational personnel are discriminatory under the ADA and, further, to the extent that he seeks to conduct discovery pertaining to his MGDPA claim.

AND, It is—

RECOMMENDED:

1. That the School District's Motion to Dismiss [Docket No. 2] should be denied, except that the Plaintiff's claim to enforce the HRO's Order should be dismissed without prejudice; his claim for reimbursement of educational costs and expenses, during the 1994–1995 school year, should be dismissed with prejudice; and his claim for compensatory education, during the 1994–1995 school year, should be dismissed with prejudice.

2. That the Commissioner's Motion to Dismiss [Docket No. 4] should be granted, except that the Plaintiff's claim, that the Commissioner failed to ensure that he received special education services from October of 1993, through April of 1994; and his ADA claims that are premised upon discrimination in personnel qualifications, and upon the establishment of a State facility devoted to children suffering from apraxia; should not be dismissed at this time.

3. That the Plaintiff's Motion for Judgment on the Pleadings or, alternatively, for Summary Judgment [Docket No. 6], should be denied.

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon

all parties **by no later than April 10, 1996,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than April 10, 1996,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.